Filed 12/11/25  In re Julian G. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Julian G., a Person Coming Under the Juvenile Court Law. | B341079 |
| | (Los Angeles County Super. Ct. No. 23LJJP00409-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTOPHER H., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Judge.  Affirmed; motion to dismiss is denied.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

**INTRODUCTION**

Christopher H., the father of minor Julian G. (born 2017), appeals the juvenile court's order at the six-month review hearing that he received reasonable reunification services. Christopher was incarcerated at the time. We affirm because the record contains substantial evidence supporting the juvenile court's finding there was clear and convincing evidence Christopher received regular telephone visitation with Julian and referrals to court-ordered programs.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Dependency Petition, Jurisdiction, and Disposition*

In December 2023, the Los Angeles County Department of Child and Family Services (Department) filed a Welfare and Institutions Code section 300[1] petition alleging seven-year-old Julian and his older half-siblings J.M. and I.G. were at risk of serious physical harm due to domestic violence between Julian's mother M.G. and her partner A.P.T. as well as physical abuse by

———————————————

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

A.P.T. toward Julian and I.G.[2]  (See § 300, subds. (a), (j).)  The petition further alleged M.G. failed to protect the children from the domestic violence and physical abuse by A.P.T. and from substance abuse by M.G. and A.P.T.  (§ 300, subd. (b).)

In the Department's detention report, M.G. identified Christopher as Julian's biological father.  M.G. told the Department that Christopher "has never been a present/involved father for Julian" and that Christopher "has been in and out of jail."  The Department reported that Christopher was currently incarcerated at North Kern State Prison.[3]  At a detention hearing on December 12, 2023, the juvenile court detained Julian from M.G. and ordered the Department to contact Christopher.  Julian and his siblings were placed with Julian's paternal grandparents.

In January 2024, Christopher appeared remotely with his appointed counsel.  At Christopher's request, the court ordered a DNA test to determine Julian's paternity and granted Christopher alleged-father status pending the test results.  Over Christopher's objection, the court deemed A.P.T. the presumed father of all three children as "[h]e's held the children out as his own" and "[t]he children refer to him as dad."

The juvenile court sustained the dependency petition as alleged at the jurisdiction hearing on March 1, 2024.  At a disposition hearing on March 26, where Christopher appeared

---

[2]  Christopher is not the father of J.M. or I.G., and his appeal only concerns Julian.  Julian's mother M.G. is not a party to this appeal.

[3]  Among other incidents, Christopher's criminal history included a 2022 conviction for possession of a controlled substance and a 2018 assault with a firearm for a domestic violence incident involving M.G.

3

remotely and was represented by counsel, the court found Christopher was Julian's biological father based on DNA test results, but it determined Christopher did not qualify as Julian's presumed father. The court declared Julian and his siblings dependents of the juvenile court under section 300, removed the children from their parents, and ordered reunification services and visitation for M.G., A.P.T., and Christopher. The court determined that Julian's placement with Christopher as a noncustodial parent would be detrimental to Julian's wellbeing because "Julian does not really have a relationship with his father" and there is "no evidence as to [Christopher]'s ability to support Julian, [or] provide for him while he is incarcerated." The reunification services ordered for Christopher included a full drug and alcohol program with weekly testing, cognitive behavioral intervention programs, and family liaison services offered through the prison.

B.  *Christopher's Reunification Services and the Six-month Review Hearing*

In March 2024, a Department clinical social worker met with Christopher at North Kern State Prison to explain her "role and purpose." At this meeting, Christopher acknowledged "he has been in and out of jail and prison for most of his life" and had used "crystal meth on and off in his adult life." The social worker "explained to [Christopher] that [the Department] would like to see him participate in the prison offered substance treatment program and for [Christopher] to work with the Family Liaison Services in the prison so he can participate in a parenting class. [Christopher] reported he is open to participating in those programs and would meet with his counselor so he can discuss

4

enrollment.  However, [he] reported that when he first arrived at [North Kern State Prison] he was informed that there are long wait lists for some of the programs . . . [and] he is currently on a wait list for anger management classes and narcotics anonymous classes."  Christopher also expressed interest in visits with Julian and his "hope to . . . be in my son's life" once he was released.

That same day, the social worker spoke with a litigation office assistant at North Kern State Prison and learned Christopher "has access to education and community resources through his assigned counselor," although "some of the programs are impacted and have wait lists."  The litigation office assistant "reported it would be up to [Christopher] to contact his counselor and discuss voluntary enrollment in any of the programs."  From this conversation, the Department identified specific programs at North Kern State Prison for Christopher, including "integrated substance use disorder treatment" and "family liaison service[s]."

The Department next spoke with Christopher on August 1, 2024.  Christopher reported "'he wanted to check in and inform [the Department] that he has completed [Narcotics Anonymous] classes and received a certificate on 7/26/2024" and that "he received a certificate for Anger Management classes as well."  Christopher also stated that he was currently enrolled in "Dad[s] Against Drugs" and "Passages," a faith-based drug recovery program.

On August 13, 2024, Christopher reported he "would be release[d] from prison in October 2024," and the Department told him it would provide "referrals for housing services once he is released."  Christopher also reported "he completed a[nother] program," although he could not remember "the name of the program," and he provided the Department with a link "to obtain

5

a copy of his certificate of completion." On September 17, 2024, the Department obtained two certificates of programs completed by Christopher, namely anger management and domestic violence prevention classes.

The Department's status review report dated September 25, 2024 stated that Christopher "remains incarcerated. Therefore, he has been unable to comply with his Court case plan and/or it is currently unknown what he has been able to complete during his incarceration." The report also noted Christopher was participating in "weekly monitored . . . phone calls with his son, Julian," which were "going well, and without any issues." The Department noted that while Christopher was entitled to "in person visits every other month," "the caregivers and [Christopher] are in agreement about the child not having any visits with him while incarcerated, as they do not want to expose the child to that environment." The Department further stated it "has been unable to properly assess [Christopher]'s progress or sobriety since he remains incarcerated. Furthermore, it remains to be seen if there has been any personal growth during his incarceration or if he will continue the same pattern of behavior."

At the six-month review hearing on September 25, 2024, Christopher did not appear but was represented by counsel. Christopher's counsel argued the Department had failed to provide Christopher with reasonable services, asserting there was no "effort by the social worker reaching out to the prison, asking what services are available, providing a list of what services are available." Counsel requested continuation of services for Christopher. The Department asserted Christopher had received reasonable services, as "he was provided with

referrals," and the Department was "working with father on an ongoing basis" and "did facilitate phone visits" for Christopher.

After the hearing, the court determined that continued dependency jurisdiction was necessary, and it would be detrimental to return the children to their parents. The court found Christopher was in substantial compliance with his case plan, "tak[ing] into account [his] incarceration," and noting "he's the only one of the parents who has been making progress." The court stated that since Christopher was in custody, "the fact that he was able to do these [Narcotics Anonymous programs] . . . is quite impressive." The court also noted that Christopher would be released from custody by the next review hearing. The court concluded the Department made "reasonable efforts to return the children to a safe home" and it ordered continued reunification services for all parents.

Christopher timely appealed from this order.

C.    *Subsequent Dependency Proceedings*

After Christopher filed this appeal, the juvenile court terminated family reunification services for all parents at a 12-month review hearing on April 17, 2025.[4] At the time of the hearing, Christopher had been released from prison but was arrested and reincarcerated on new pending charges, and there

_____

[4]    At the Department's request, we grant judicial notice of the juvenile court's order of April 17, 2025. On our own motion, we take judicial notice of the record in writ proceedings Christopher initiated from this order, and the juvenile court's minute orders from January to November 2025. (See Evid. Code, §§ 452, subd. (d) [judicial notice may be taken of "[r]ecords of . . . any court of this state"], 459.)

7

was no new information about his progress in services. The court found the Department had provided reasonable services and noted that Christopher was in "partial compliance" with his case plan but found Julian's parents had made "unsubstantial" progress overall. The court set a section 366.26 permanency planning hearing for Julian on August 15, 2025, which has since been continued.

Christopher filed a notice of intent to file a writ petition from this order. On May 19, 2025, Christopher's appointed counsel submitted a letter identifying no "potential issues" supporting a writ petition. (See *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 584 ["when an attorney evaluates a case and determines there is no potentially meritorious issue to be raised [regarding the termination of reunification services], a petition for extraordinary writ simply should not be filed"].) This court granted 15 days for Christopher to file a writ petition in propria persona, but Christopher did not file a petition within this time and the matter was deemed a nonoperative writ.

As of the date of this opinion, dependency jurisdiction is ongoing and the juvenile court has not yet held Julian's permanency planning hearing or terminated parental rights.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).) During the reunification stage, "[w]hen a child has been removed from a parent's custody, the court ordinarily must

8

order child welfare services designed to facilitate the reunification of the family." (*Id.* at p. 624.) "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.) "To balance the interest in family preservation with the child's interest in the prompt resolution of [his] custody status and long-term placement, the dependency law establishes a detailed timeline for reunification." (*Michael G.,* at p. 625.) As relevant here, "[p]arents of children three or older are presumptively eligible for at least 12 months of services." (*Ibid.*) "The court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.' (Welf. & Inst. Code, § 366.21, subd. (g)(4).) In other words, at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G.*, at p. 625 [footnote omitted].) Similarly, the court may not terminate parental rights if it finds "'the department has failed to offer or provide reasonable reunification services to a parent throughout the reunification period.'" (*Id.* at p. 629, italics omitted; see § 366.26, subd. (c)(2)(A).)

"When reunification services are ordered, the reunification plan 'must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.'" (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1474.) At the six-month review hearing, "[i]f the child is not returned to

9

their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (e)(8).) "[T]o support a finding that services were reasonable, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.'" (*Michael G.*, *supra*, 14 Cal.5th at p. 625, fn. 6.) "The department must make a ""good faith effort"" to provide reasonable services responsive to the unique needs of each family." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010 (*Mark N.*), superseded by statute on other grounds as stated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504.) "The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case." (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451; accord, *Mark N.*, at pp. 1010-1011.)

A parent's incarceration does not relieve the Department's duty to provide reasonable reunification services. If a parent is incarcerated, "the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." (§ 361.5, subd. (e)(1).) "The department must preliminarily identify services available to an incarcerated parent" and "cannot delegate to an incarcerated parent the responsibility for identifying such services." (*Mark N.*,

10

*supra*, 60 Cal.App.4th at p. 1012.) "The department's employees may not simply conclude that reunification efforts are not feasible on the sole ground the parent is incarcerated." (*Ibid.*)

"In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated . . . parent's access to those court-mandated services and ability to maintain contact with the child, and shall document this information in the child's case plan." (§ 361.5, subd. (e)(1).) "Services may include, but shall not be limited to, all of the following: . . . Maintaining contact between the parent and child through collect telephone calls," "[t]ransportation services, when appropriate," "[v]isitation services, when appropriate," and "[r]easonable services to extended family members or foster parents providing care for the child." (*Id.*, subds. (e)(1)(A)-(D)(i).) "An incarcerated or detained parent may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided." (*Id.*, subd. (e)(1)(D)(ii).)

"'When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence.' [Citation.] 'In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.'" (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1061-1062 (*A.O.*); see *In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 [when applying substantial evidence standard with respect to reasonable services finding, "we bear in mind the heightened burden of proof"].) "We must

11

view the evidence in the light most favorable to the department and indulge all legitimate and reasonable inferences to uphold the order." (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1010; accord, *In re Monica C.* (1995) 31 Cal.App.4th 296, 306 (*Monica C.*).)

B.    *Christopher's Appeal Is Not Moot*

After Christopher filed his opening brief, the Department moved to dismiss this appeal as moot.  Citing *In re Rashad D.* (2021) 63 Cal.App.5th 156, the Department argues that because "the juvenile court has terminated family reunification services below, and Christopher did not file a petition for extraordinary writ challenging [this] order . . . , there is no relief this Court can provide."

Christopher opposes dismissal.  Because the juvenile court has not terminated dependency jurisdiction, Christopher asserts that "if reunification services were inadequate . . . this Court has power to order the juvenile court to provide additional services." Christopher also argues his appeal is not moot because he "remains at peril of losing his parental rights and so there is immediate and real prejudice from a finding of error in the reunification process."  Finally, Christopher requests this court "exercise its discretion to hear the matter regardless of mootness" because "the adequacy of reunification services" undergirds "the constitutionality of California's dependency scheme to protect families."

"A case becomes moot when events "'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief.'"  [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the plaintiff must complain of an ongoing harm.  Second, the harm must be

12

redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276.) "A reviewing court must '"decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding.""" (*Id.* at p. 276.) Even if a case is moot, however, "courts may exercise their 'inherent discretion' to reach the merits of the dispute" in light of "the overarching goals of the dependency system: 'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.'" (*Id.* at pp. 282, 286.)

Here, as Christopher argues, it is possible that the reasonable services finding may impact further dependency proceedings, which remain ongoing. (See *A.O.*, *supra*, 111 Cal.App.5th at pp. 1059, 1061 [discussing "the potential negative impact of an erroneous reasonable services finding," including "the erroneous termination of parental rights"]; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769 ["An issue is not moot if the purported error infects the outcome of subsequent proceedings."].) But even if Christopher's appeal is moot, we exercise our discretion to consider the merits and deny the Department's motion to dismiss the appeal. (Cf. *Michael G.*, *supra*, 14 Cal.5th at p. 623, fn. 2 [exercising discretion to consider reasonable services claim after dependency jurisdiction was terminated].)

The Department further argues that Christopher may not directly appeal the reasonable services finding, relying on *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, which held that a parent cannot "appeal from the isolated finding . . .

13

that reasonable reunification services had been provided" because an "order continuing reunification services was not adverse to [the parent's] interest." (*Id.* at pp. 1150, 1153.) The Department acknowledges, however, that *Melinda K.*'s holding has been "superseded" by subsequent case law. (*A.O.*, *supra*, 111 Cal.App.5th at p. 1059 [determining a "reasonable services finding would be adverse to [parent] if erroneous"]; see *In re S.B.* (2009) 46 Cal.4th 529, 534 ["review of findings is normally obtained by appeal from the ensuing judgment or order"]; *In re T.G.* (2010) 188 Cal.App.4th 687, 693-696 ["question[ing] the holding in *Melinda K.*" in light of *In re S.B.* and holding "the reasonable services finding contained within the order made at the six-month review hearing is adverse to his parental interest in reunification"].) Accordingly, we determine Christopher may challenge the reasonable services finding in his appeal from the juvenile court's six-month review hearing order. (See *A.O.*, at p. 1061 [a "parent may obtain appellate review of [a reasonable services] finding by appealing the order in which it was made, even if the parent is not challenging any other part of that order"]; accord, *T.G.*, at p. 695.)

C.    *Substantial Evidence Supports the Juvenile Court's Finding the Department Provided Christopher With Reasonable Reunification Services*

Christopher argues he did not receive reasonable reunification services because "the record does not show that the Department substantially assisted [him] in obtaining, completing or documenting services while he was incarcerated" and because the Department did not facilitate visitation with Julian. We conclude the record contains substantial evidence from which the

14

juvenile court could determine by the clear and convincing evidence standard that the Department facilitated reasonable reunification services and visitation.

As stated, the juvenile court found that Christopher received reasonable services because the Department provided Christopher with "referrals," that it was "working with father on an ongoing basis," and that the Department "facilitate[d] phone visits" for Christopher. Substantial evidence supports its findings.

The record reflects a Department social worker visited Christopher in March 2024 at the prison to discuss reunification and visitation. At that visit, the two discussed the drug treatment and family liaison services programs at North Kern State Prison, and Christopher stated he would "meet with his counselor so he can discuss enrollment" and that there might be "long wait lists." The Department confirmed with a litigation office employee at the prison that Christopher could access the recommended reunification services "through his assigned counselor" based on "voluntary enrollment," i.e., it was "up to [Christopher] to contact his counselor." The litigation office employee also "verified that some of the programs . . . have wait lists." (See *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1111 [affirming reasonable services where Department contacted incarcerated mother and "explain[ed] the types of programs she could search for in prison and encourag[ed] her to stay in touch"]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1363 (*Ronell A.*) [affirming reasonable services finding where department "organize[d] a plan under which [incarcerated] mother was to attend parenting classes and a drug rehabilitation program" and "made clear to mother . . . the importance of early participation in

15

the programs"]; cf. *In re Maria S.* (2000) 82 Cal.App.4th 1032, 1040 [no reasonable services where "the record is devoid of any evidence to suggest what services, if any, were identified as available or offered to [mother] during her incarceration"]; *Mark N.*, *supra*, 60 Cal.App.4th at p. 1013 [same, where "the department made *no* effort to determine whether any services were available or could be provided to the incarcerated father" and "never contacted any institution to determine the availability of services"]; *Monica C.*, *supra*, 31 Cal.App.4th at p. 307 [same, where Department "delegate[ed] to [mother] the responsibility of sending her case worker a list of available services in prison"].)

Christopher argues it is "uncertain" what the Department did "to facilitate [him] being provided services," and that there was "nothing" to show "what measures the social worker [undertook] to contact the Prison or to assist [Christopher] in enrolling in the specific requirements of the services plan." Christopher argues the Department's reports "do not indicate who, if anyone, at the North Kern [State] Prison the social worker contacted to discuss the programs available to [him]."

To the contrary, as stated, there is substantial evidence in the record that the Department identified available services at the prison, contacted the prison to discuss Christopher's enrollment in the court-ordered services, and that enrollment was contingent on Christopher working with his prison counselor. The record reflects that Christopher was able to access drug treatment services. While it does not appear that Christopher was able to enroll in all of the specific reunification services ordered by the juvenile court (i.e., weekly drug testing, cognitive behavioral intervention, and family liaison services), the record supports that the availability of these services was subject to wait

16

lists and, according to the prison, the Department could not take any action to enroll Christopher in these services.  "[W]hile the department cannot tell prison officials how to run their institutions, it can:  notify the prison an incarcerated parent is in need of reunification services; determine whether any appropriate services are available at the particular institution in question; and explore whether changes . . . can be made to facilitate the provision of such services."  (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1013 ["the department should, at a minimum, . . . contact[] the relevant institutions to determine whether there [i]s any way to make services available"]; *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1029, 1032 (*Fabian L.*) [reunification services provided to incarcerated father were "not unreasonable" although prison "could not offer Father any meaningful reunification-relevant resources"].)

There is substantial evidence the Department made a good faith effort by identifying appropriate services for Christopher at North Kern State Prison and discussing Christopher's ability to enroll in these programs with a prison official.  (See *Mark N.*, *supra*, 60 Cal.App.4th at p. 1013 [if "no services were available to [father] in prison . . . his inability to participate was not the department's fault"]; see also § 361.5, subd. (e)(1)(D)(ii) [an incarcerated parent "may be required to attend . . . programs as part of the reunification service plan if actual access to these services is provided"]; see *Fabian L.*, *supra*, 214 Cal.App.4th at p. 1029 ["under section 361.5, Father was not expected to participate in services that were not available"].)  There is also no indication in the record that Christopher reached out to the Department in need of assistance with his reunification services, and when he contacted the Department, it was to update them on

17

his progress in programs.  (See *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1163, 1165-1166 [inadequate reunification services where Department "fail[ed] to respond" to incarcerated father's inquiries about visitation and resources and "never reviewed his [reunification] plan with him or gave him advice on programs he could or should be doing to secure his parental rights"]; accord, *Mark N.*, at p. 1012 [same, where Department failed to answer incarcerated father's inquiries].)  Additionally, the Department's efforts were reasonable in light of Christopher's previously limited involvement in Julian's life.  (See *In re Joshua M.* (1997) 56 Cal.App.4th 801, 809 [noting an incarcerated father "received services consistent with his situation and his relationship with the child"].)  Christopher does not cite any case requiring the Department to do more to provide reasonable services under these circumstances.

As to visitation, Christopher argues that he was "able to have contact with [Julian] . . . [because] of his family's efforts, not the Department's," and "[t]he Department's role in 'facilitating' visits was essentially zero."  The record establishes, and Christopher does not dispute, that Christopher agreed to waive in-person visitation with Julian while he was incarcerated and that he received weekly monitored telephone calls with Julian as ordered by the juvenile court.  While the record does not specifically indicate that the Department facilitated these visits, the court ordered the Department to "work with paternal grandmother to arrange for phone calls and in-person visits between Julian and [Christopher]."  Given that telephone visits occurred as ordered, and that the Department was in contact with the paternal grandparents to monitor Julian and his siblings' wellbeing, it is reasonable to infer under these

18

circumstances that the Department facilitated Christopher's telephone visitation with Julian.  (See *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [reviewing court must "indulge in all legitimate inferences to uphold the court's order"]; accord, *Ronell A., supra*, 44 Cal.App.4th at p. 1361.)  On this record, substantial evidence supports the juvenile court's determination that the Department provided Christopher with reasonable reunification services, including visitation and court-ordered treatment programs.

## DISPOSITION

The juvenile court's order finding reasonable reunification services at the six-month review hearing is affirmed.  The motion to dismiss is denied.


MARTINEZ, P. J.


We concur:



FEUER, J.



STONE, J.


19